**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Joshua Weedman
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
        sam.hershey@whitecase.com
        jweedman@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: mandolina@whitecase.com
        gregory.pesce@whitecase.com

**WHITE & CASE LLP**
Aaron Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF CELSIUS NETWORK LLC, *et al.*, on behalf of the estate of Celsius Network LLC, | ) ) ) | Adv. Proc. No. __ - _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

v.                                                    )
                                                      )
CELSIUS NETWORK LIMITED,                              )
                                                      )
                        Defendant.                    )
                                                      )
                                                      )

## COMPLAINT

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned

debtors and debtors-in-possession (collectively, the "**Debtors**," and together with their non-Debtor

affiliates "**Celsius**" or the "**Company**"), by and through its undersigned counsel, derivatively on

behalf of and as the representative of the estate of Celsius Network LLC ("**LLC**"), as Plaintiff in

the above-captioned adversary proceeding, and based upon knowledge, information, belief, and

the result of the Committee's investigation to date, alleges as follows:[2]

## NATURE OF ACTION

1.       Facing adverse regulatory actions in the United Kingdom, Celsius Network Limited

("**CNL**") entered into a series of sham transactions designed to keep its business running at the

expense of its customers, who, as a result, may find themselves with no recourse against the entity

that actually holds a material portion of the corresponding digital assets.   Through a set of

conflicted, undated, incomplete, and unobserved contractual agreements (the "**Intercompany**

**Agreements**"), executed by a director and officer of CNL on behalf of LLC, CNL purported to

---

[2] The Committee submits this Complaint pursuant to the *Order Setting Schedule Regarding (I) Estimation Of Certain Intercompany Contract Claims Between Celsius Network LLC And Celsius Network Limited, (II) Substantive Consolidation Of Celsius Network LLC And Celsius Network Limited, And (III) Constructive Fraudulent Transfer Claim* [Dkt. No. 2522] (the "**Scheduling Order**").  In accordance with the Scheduling Order, the Committee has not yet taken discovery in connection with the matters raised in this Complaint.  Accordingly, the Committee reserves the right to amend, supplement or modify the allegations and counts in this Complaint, including in the opening brief to be filed pursuant to the Scheduling Order.

transfer all of the assets and liabilities connected to its customer-facing business to U.S.-based LLC. But this was all a façade. In fact, CNL retained nearly all of the customer assets so that it could continue to deploy them despite warnings from the Financial Conduct Authority (the "**FCA**"), a UK regulatory authority, that CNL was to cease all retail operations in the United Kingdom. At the same time, CNL transferred billions of dollars' worth of liabilities to LLC. It then entered into a separate agreement with LLC under which LLC purported to "loan" customer assets—which had never been LLC's in the first place—back to CNL. Together, these transactions stranded Celsius' obligations to customers an ocean away from their corresponding assets and left LLC, in the words of this Court, "hopelessly insolvent."[3]

2.      But CNL did not stop there. CNL also caused LLC to transfer assets that it subsequently received from customers to CNL and away from LLC, further deepening LLC's insolvency. No matter how you slice it, CNL used LLC for its own purposes, fraudulently transferring billions of dollars of assets and obligations to and from LLC for no consideration. All told, CNL dumped over $10.3 billion of liabilities onto LLC, and pilfered billions of dollars of assets from LLC, all for the benefit of CNL's stakeholders and to the detriment of LLC's.

3.      The Committee brings this action for constructive fraudulent transfer seeking avoidance of the initial transfer of customer liabilities from CNL to LLC and the subsequent transfers of assets from LLC to CNL, so that LLC can provide its creditors their rightful recovery in these Chapter 11 Cases. CNL's transfer of customer liabilities to LLC, LLC's subsequent "loan" of customer assets back to CNL (assets that it never owned), and the thousands of intercompany

---

[3] By separate Motion, and in accordance with the Scheduling Order, the Committee is also seeking substantive consolidation of CNL and LLC. In addition, and as the class proof of claim filed by the Committee makes clear [Dkt. No. 2556], substantial grounds exist for LLC to assert an actual fraudulent transfer claim against CNL, as well as several other claims and causes of action. Consistent with the Scheduling Order, those claims are not being asserted in this Complaint. However, the Committee reserves the right to assert those claims and causes of action.

transfers in which LLC sent digital assets to CNL meet the criteria for constructive fraudulent transfers as set forth in the Bankruptcy Code and applicable non-bankruptcy law. Holding only liabilities without the customer assets needed to satisfy them, LLC was uncontrovertibly insolvent at the time of, and as a result of, those transactions. Alternatively, LLC was left with grossly insufficient capital as a result of those transactions and was thus under-capitalized to meet its obligations. Finally, LLC received less than reasonably equivalent value for those transactions. In fact, LLC effectively received *no* consideration at all, given that CNL transferred its obligations to LLC without transferring any material digital assets at the time of the Migration, and the Intercompany Agreements governing those transfers did not include any date for repayment to LLC, timeline for interest payments to LLC, or interest rate to be paid to LLC (nor was interest ever paid).

4.      CNL's stakeholders—including its equityholders who had board seats at Celsius—should not be permitted to benefit from the complex web of transactions that CNL spun to evade regulatory action meant to protect its customers and conceal its fraudulent receipt and retention of billions of dollars' worth of customer assets. Accordingly, the Court should allow LLC to avoid and receive a claim in the amount of the liabilities fraudulently transferred from CNL to LLC, and avoid and recover the amount of the assets fraudulently transferred from LLC to CNL.

## JURISDICTION

5.      This adversary proceeding is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Federal subject matter jurisdiction also exists under 28 U.S.C. § 1332(a) based on complete diversity of citizenship of the parties and

because the amount in controversy, exclusive of interest and costs, exceeds $75,000, and under 28 U.S.C. § 1331.

7.    This Court has personal jurisdiction over all of the Defendants pursuant to Bankruptcy Rule 7004.  All of the Defendants have maintained minimum contacts with the United States in connection with the claims asserted herein, including, among other things, by filing voluntary bankruptcy petitions with this Court.

8.    Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases commenced under the Bankruptcy Code.[4]

### PARTIES[5]

9.    On July 13, 2022, (the "**Petition Date**"), Celsius Network LLC, Celsius KeyFi LLC; Celsius Lending LLC; Celsius Mining LLC; Celsius Network, Inc.; Celsius Network Limited; Celsius Networks Lending LLC; Celsius US Holding LLC; GK8 Ltd; GK8 UK Limited; and GK8 USA LLC (collectively the "**Debtors**"), other than GK8 Ltd, GK8 UK Limited, and GK8 USA LLC (collectively, the "**GK8 Debtors**"), filed voluntary petitions for relief in this Court under Chapter 11 of the Bankruptcy Code.  On December 7, 2022, the GK8 Debtors filed voluntary petitions in this Court under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

---

[4] Pursuant to Bankruptcy Rule 7008, the Committee consents to the entry of final orders or judgments by this Court.

[5] Plaintiff reserves the right to name additional defendants, including through amendment of this Complaint.

10.     Plaintiff is the Official Committee of Unsecured Creditors appointed on July 27, 2022 by the Office of the United States Trustee pursuant to section 1102(a)(1) of the Bankruptcy Code [Docket No. 148].

11.     The Committee brings this action derivatively on behalf of the estate of LLC.  The Debtors have agreed to give the Committee non-exclusive standing on behalf of LLC to pursue the causes of action set forth herein.

12.     LLC is a Delaware limited liability company with headquarters in Hoboken, New Jersey.  LLC is wholly owned by Celsius US Holding LLC, which is in turn wholly owned by CNL.

13.     Defendant CNL is a United Kingdom private limited company with offices in the United Kingdom, Cyprus, Israel, and Las Vegas, Nevada.

## STATEMENT OF FACTS

**I.** **CNL, Facing Regulatory Scrutiny over Its Deployment of Customer Assets, Devises a Scheme to Continue Those Deployments While Offloading Corresponding Customer Liabilities**

14.     On February 9, 2018, CNL was incorporated under the laws of England and Wales. CNL was and remains the top-tier operating company within the Celsius corporate family.

15.     From its founding until August 2021, CNL was the sole Celsius entity with which Celsius' account holders contracted under Celsius' terms of use.  Indeed, as of the Petition Date, 55% of account holders first (and, in some cases, exclusively) transferred digital assets to Celsius under a version of the Terms of Use in which CNL was the sole contracting entity.  As a result, on information and belief, the vast majority of assets that customers transferred to Celsius were historically held by CNL.  Indeed, as of the Petition Date, CNL possessed digital assets the Debtors have found were worth $1,150,496,943.64, the vast majority of which were assets transferred to

Celsius by its customers. CNL would deploy and invest those customer assets to generate yield for customers and profits for Celsius.

16. Throughout its history, CNL acted recklessly with customer funds. For most of its existence, CNL lacked effective risk management systems and made investment decisions in an ad hoc manner, on occasion transferring hundreds of millions of dollars' worth of cryptocurrency to counterparties with little to no diligence. To the extent Celsius attempted to track its billions of dollars of assets, investments or positions across the Company, it did so using spreadsheets. And, despite its employees' repeated statements that they could not accurately assess its positions, it did not adequately fix the problem. CNL further invested its customers' funds in speculative investments, failed to implement proper oversight mechanisms, and failed to properly monitor its trading positions.

17. While CNL repeatedly and consistently depicted Celsius as completely regulatory-compliant, in reality, CNL was exposed to significant regulatory risk, and exposed LLC to those same regulatory risks from its inception. For example, on May 14, 2021, the Texas State Securities Board notified Celsius that it may have offered securities in Texas in violation of Texas securities law and issued a notice of hearing on September 17, 2021. Also on May 14, 2021, the New Jersey Bureau of Securities sent CNL a letter stating that CNL "may be offering and selling securities to and from New Jersey." The SEC sent CNL a letter on July 23, 2021 announcing that it was investigating whether CNL had violated the federal securities laws. The Alabama Securities Commission issued an order to show cause on September 16, 2021. And a cease-and-desist order was entered against Celsius in Kentucky on September 23, 2021. On September 17, 2021, the New Jersey Bureau of Securities found that Celsius was offering unregistered securities in violation of New Jersey law and ordered Celsius to cease and desist from offering Earn accounts

to unaccredited investors in the United States.  Despite these clear warnings, CNL did not take the necessary steps to properly address these regulatory issues, and exposed LLC to severe regulatory risks upon its creation.

18.   By the summer 2021, it became clear that CNL's (and Celsius as a whole's) business was subject significant risk of fines and criminal penalties and, as a result, CNL could no longer be the "customer facing" entity.  The prior year, CNL had filed a 5th Money Laundering Directive Application ("**5MLD**"), an application that must be approved by the FCA in order for a company to carry out cryptocurrency activities in the United Kingdom.  CNL's application was not granted.  Rather, on June 11, 2021, the FCA informed Celsius that it had determined that CNL's business amounted to an unregistered collective investment scheme under the UK's Financial Services and Markets Act, 2010.  The FCA demanded that Celsius remove certain promotional material from its website (which Celsius admitted misrepresented fundamental aspects of its business model, including how it set interest rates) and stop offering investments to UK customers without prior FCA approval.  The FCA further recommended that Celsius withdraw its pending 5MLD.  The FCA informed Celsius that if Celsius did not withdraw its 5MDL Application, the FCA would recommend that the decision-making body (the Regulatory Decisions Committee) refuse the application.

19.   CNL could no longer serve as the customer-facing entity within the Celsius framework.  That presented a problem for Celsius.  First, the vast majority of investing and deployment activities were conducted through CNL, which needed access to customer assets to continue those activities.  Second, the vast majority of assets that customers transferred to Celsius were held by CNL.

20.     The solution to this problem was simple: designate a new entity to interface with customers and handle their assets.  But that is not what Celsius did.  Rather, Celsius sought to give the appearance of adopting this solution, while allowing CNL to remain the entity primarily responsible for investing and deploying customer assets, even as it no longer maintained a contractual relationship with those customers.[6]  To achieve this goal, Celsius undertook a series of ill conceived, conflicted, undocumented and not effectuated sham transactions that separated customers from the assets they had deposited and stuck LLC with liabilities to those customers but no assets to satisfy those liabilities.  Even after these transactions, CNL continued to deploy customer assets despite the FCA's warnings.

21.     Finally, these transactions gave rise to a multi-billion dollar intercompany claim against CNL by LLC, which CNL never attempted to repay, could not reasonably have repaid, and for which LLC never received interest or other consideration.

## II.   CNL Undertakes the Sham "Migration," Offloading Customer Liabilities onto LLC while Retaining Customer Assets

22.     To give the appearance of following the FCA's directives, Celsius needed to designate a new member of the corporate group as the customer-facing entity.  Celsius did so by creating the Delaware-incorporated LLC, an indirect, wholly-owned subsidiary of CNL.  Following the creation of LLC, the resulting corporate structure of the Celsius group (as it existed on the Petition Date) was as follows:

---

[6]   The Committee does not agree with this characterization of the contractual relationship between CNL and Celsius' customers.  Although the Court determined that customers only had contract claims against LLC in its *Order Regarding Which Debtor Entities Have Liability for Customer Contract Claims Under the Terms of Use* [D.I. 2265], the Committee has appealed that determination.  *See Notice of Appeal* [D.I. 2356].



23.　　In response to adverse regulatory action in the U.K., Celsius announced the formation of LLC in a Medium blog post where it stated that it was "migrating [its] main business activity and headquarters from the United Kingdom to the United States and where applicable, to several other jurisdictions." Celsius also declared its intention to migrate all customer assets and obligations arising from transactions on the Celsius Platform from CNL to LLC (the "**Migration**"). On July 22, 2021, Celsius issued Version 6 of the Terms of Use. Version 6 amended the contracting party from CNL to LLC "and its Affiliates," which included CNL.

24.　　Yet despite this messaging to the regulators, as shown below, the purported "Migration" from CNL to LLC was a lie.

25.　　The Migration was purported to be effectuated through three undated (and in one case, unexecuted), conflicted intercompany agreements between LLC and CNL.

### A.    **The Asset Transfer Agreement**

26.    On December 29, 2021, CNL, as "Transferor," and LLC, as "Transferee," entered into an Asset Transfer Agreement, which was backdated to August 19, 2021 (the "**Asset Transfer Agreement**").[7]  The Asset Transfer Agreement is signed by Alex Mashinsky on behalf of CNL and Daniel Leon on behalf of LLC.  Mr. Leon, the signatory for LLC, was a co-founder of Celsius who served at the time as a director, Chief Strategy Officer and Chief Operating Officer at CNL. The Asset Transfer Agreement is governed by Delaware law with exclusive jurisdiction in New York.

27.    The recitals to the Asset Transfer Agreement explain that "certain regulatory limitations"—*i.e.*, the FCA's admonitions to Celsius—caused CNL to "determine[] to stop providing services to or contracting with Celsius' users."  But, as the Asset Transfer Agreement makes clear, the purpose of that agreement was to cover-up that CNL continued to manage assets deposited by customers while using LLC as a front.  Indeed, despite its name, the Asset Transfer Agreement does not transfer assets, only liabilities.

28.    Specifically, the Asset Transfer Agreement provides that "Transferor wishes to transfer, and Transferee wishes to accept and assume, certain assets and liabilities . . . listed on Exhibit 1 hereto."  But Exhibit 1 does not explicitly transfer title nor does it list any assets.  Rather, Exhibit 1 lists the following:

> a.    All of CNL's obligations related to or resulting from the account holders' use of the Celsius App, including any obligation of CNL to return collateral following repayment of a loan, all obligations to repay loans and obligations to pay financing fees (i.e., "Rewards");

---

[7]    The Asset Transfer Agreement is attached hereto as Exhibit A.

    b.   The business relationship with the account holders;

    c.   All of CNL's rights related to or resulting from account holders' balances with Celsius, including the right to use any assets loaned to Celsius and collateral used to secure loans to Celsius;

    d.   A list of certain account holders and their information.

29.    Thus, while the Asset Transfer Agreement transfers to LLC CNL's billions of dollars of liabilities to customers, as well as certain contractual rights and relationships, nowhere does it provide that title to *any* of the customer assets giving rise to those liabilities and relationships would be transferred to LLC. Indeed, while Celsius booked the Migration as a transfer of billions of dollars of assets from CNL to LLC, that was a lie, as Celsius employees recognized in correspondence with tax advisers at Ernst & Young ("**EY**"), noting that the exchange between CNL and LLC included "an assumption of liabilities and not a transfer of ownership of the assets" and that "the assets were not transferred, only liabilities were assumed by LLC." Moreover, Celsius employees acknowledged in emails that all deployment activities remained with CNL, which would have been impossible if the assets being deployed were no longer in CNL's possession.

30.    Additionally, the Asset Transfer Agreement does not identify the consideration, if any, that CNL would provide to LLC in exchange for LLC's assumption of billions of dollars of customer liabilities. Nor does the Asset Transfer Agreement set a date by which LLC will receive such consideration, provide an interest rate payable to LLC, or set a schedule for interest payments. Rather, section I.2 of the Asset Transfer Agreement provides that "[t]he consideration for the Transferred Assets and Liabilities shall be determined according to the arm's length standard as stated in the U.S. Transfer Pricing rules pursuant to Internal Revenue Code § 482 and the

regulations promulgated thereunder, the 2017 Organization of Economic Cooperation and Development (OECD) Transfer Pricing Guidelines, and any equivalent local tax laws, regulations, and guidelines." On information and belief, no interest or other consideration was ever provided to LLC in connection with section I.2 the Asset Transfer Agreement.

31. The Asset Transfer Agreement attaches as Exhibit 2 the second contractual agreement by which the Migration was effected: "that certain Loan Agreement . . . addressing the lending of certain cryptographic assets . . . between [CNL] and [LLC] in accordance with the terms and conditions therein." As that loan agreement makes clear, account holder assets were never intended to be transferred to LLC, as CNL wanted to keep them so it could continue to deploy and profit from them.

### B.     The Intercompany Loan Agreement

32. CNL, as "Borrower," and LLC, as "Lender," entered into an Intercompany Loan Agreement, which is undated but includes an effective date of August 19, 2021 (the "**Intercompany Loan Agreement**").[8] The Intercompany Loan Agreement is signed by Mr. Mashinsky on behalf of CNL and Mr. Leon on behalf of LLC. The Intercompany Loan Agreement is governed by the laws of England and Wales.

33. The Intercompany Loan Agreement provides that, in order to generate "Yield," LLC would loan "certain cryptographic assets" to CNL "to carry out certain yield generating activities in cryptographic assets with third parties." Among the assets that LLC purportedly lent to CNL under the agreement are "certain cryptographic assets that belong to [LLC's] Users . . . which were not transferred from [CNL] to [LLC] in connection with" the Asset Transfer Agreement. In other words, the Intercompany Loan Agreement acknowledges that CNL did not

---

[8]    The Intercompany Loan Agreement is attached hereto as Exhibit B.

transfer assets to LLC (despite the so-called "Asset Transfer Agreement"), but instead purposefully retained those assets so it could continue to deploy them. Nonetheless, the Intercompany Loan Agreement misleadingly labels the retention of those assets by CNL as a "loan" from LLC, even though those assets were never in LLC's possession to be lent out.

34.    Notably, the Intercompany Loan Agreement refers to other assets to be loaned by LLC to CNL, which are purportedly listed on Schedule A. Schedule A, however, is blank.

35.    The Intercompany Loan Agreement also provides that, in consideration for the loan to CNL, LLC would receive "Interest plus an Applicable Spread, both under Arm's Length Principle." The Intercompany Loan Agreement further defines the term "Interest" to mean "an annual interest on the unpaid balance of the Assets (which includes any unpaid accrued interest), compounded and calculated weekly based on a third-party transfer pricing benchmark and determined weekly." On information and belief, interest under the Intercompany Loan Agreement was never paid by CNL to LLC.

## C.    The Novation Agreement

36.    The third agreement meant to effectuate the Migration was the Novation Agreement (the "**Novation Agreement**").[9] The Novation Agreement is undated and, on information and belief, was never executed.

37.    The Novation Agreement is largely identical to the Asset Transfer Agreement, save for one material provision: the Novation Agreement provides that CNL "will continue to hold and deploy crypto assets" transferred by customers "and will provide an obligation to transfer such assets to [LLC] immediately upon its request." The Novation Agreement also provides that CNL would "execute a separate agreement with [LLC] to contemplate the terms and conditions of this

---

[9]    The Novation Agreement is attached hereto as Exhibit C.

obligation including the arm's length fee paid from [CNL] to [LLC]." On information and belief, such separate agreement was never executed, such fee was never calculated, and such fee was never paid.

38.    Additionally, the Novation Agreement provides that CNL, "in order to no longer provide services to or contract with" account holders, "transferred the assets and liabilities of the Business that relate specifically to [account holders] and which are the subject of regulatory limitations and requirements" to LLC. However, as shown above, that is false. CNL never actually transferred any account holder assets to LLC, and instead explicitly retained those assets, misleadingly purporting to "borrow" them from LLC even though LLC had never possessed them.

39.    Notably, in discussions with EY regarding the Novation Agreement, Celsius employees recognized the problem arising from the lack of consideration to LLC for assuming CNL's liabilities to customers, and sought to use the unexecuted Novation Agreement to paper it over. Celsius employees proposed adding a provision to the Novation Agreement in which the interest to be provided under the Intercompany Loan Agreement would be agreed to be an "appropriate fee" to LLC for assuming CNL's customer liabilities. On information and belief, however, the Novation Agreement was never updated to include this language, and, as noted above, no interest rate was ever paid to LLC, much less an "appropriate fee" to compensate for the billions of dollars of assumed liabilities.

## III.    Following the Migration, CNL Continues to Pilfer LLC

40.    As of the Petition Date, notwithstanding the purported Migration and the ostensible replacement of CNL by LLC as the customer-facing entity, all digital asset investing and institutional lending activities were still conducted by CNL. In other words, even though account holders may have initially transferred digital assets to LLC after the Migration, the digital assets were subsequently transferred by LLC to CNL to be lent or otherwise invested.

41.    In particular, following the Migration, LLC undertook numerous transfers of digital assets to CNL, resulting in a purported net receivable to LLC of $1.2 billion (and corresponding payable from CNL to LLC in the same amount).  Additionally, a large number of digital assets that CNL initially transferred to LLC were subsequently clawed back, resulting in an additional purported net receivable to LLC of $984.5 million (and corresponding payable from CNL in the same amount).[10]

## IV.    LLC Has Always Been Insolvent and Inadequately Capitalized

42.    LLC is, and always has been, insolvent.  This can be demonstrated in at least six ways.[11]

43.    First, as reflected above, at its creation, LLC was encumbered with billions of dollars of liabilities to customers, but was not provided with title to *any* customer assets or any other reasonably equivalent consideration in return.  By definition, therefore, LLC was insolvent from the start.

44.    Second, even if LLC had been given the customer assets in CNL's possession (it was not), those assets were insufficient to pay customer liabilities even at the time of the Migration. And the imbalance between customer liabilities and customer assets only grew during the time between the Migration and the Petition Date.

45.    Third, as shown above, LLC continued to transfer assets to CNL following the Migration, but did not document those transaction or have an obligation back from CNL on account

---

[10] The Committee has not undertaken a full analysis of the intercompany transfers between CNL and LLC at this time and reserves the right to amend, supplement or modify these and all other allegations in this Complaint.

[11] The Committee has not undertaken a full solvency analysis regarding LLC at this time and reserves the right to amend, supplement or modify these allegations in connection with the issuance of expert reports in this matter.

of those transactions.  Indeed, the Debtors have told the Court that there are 7,000 undocumented intercompany transactions that are not recorded.  Each transfer from LLC to CNL deepened LLC's insolvency.

46.     Fourth, even if LLC had been given customer assets in CNL's possession (it was not), LLC was entirely reliant on CNL to manage its digital assets and generate yield.  However, from LLC's inception, CNL acted recklessly with customer assets, lacked effective risk management systems, made investment decisions in an ad hoc manner, and could not accurately assess its own positions.  CNL's gross mismanagement of customer assets caused it to incur extraordinary losses and even assuming there was a valid intercompany obligations from CNL to LLC further deepened LLC's insolvency after the Migration.

47.     Fifth, CNL formed LLC without addressing any of the regulatory issues raised by U.S. regulators prior to the Migration Date or the significant penalties that LLC could incur as a result of those regulatory issues.  Accordingly, LLC was immediately subject to numerous regulatory risks in the United States without any reasonable plan to continue operations in the face of likely adverse regulatory decisions.  As a result of this unaddressed regulatory risk, LLC was subject to immediate doubt as a going concern from the moment of its formation, and had no means of repaying its debts if subject to an adverse regulatory action.

48.     Sixth, a comprehensive analysis of LLC's assets and liabilities demonstrates that LLC was insolvent from the beginning.  Specifically, as part of her final report, the Examiner set out to determine whether LLC would have been able to meet its obligations to customers.  To do so, the Examiner adjusted Celsius' consolidated financial records to eliminate any value attributable to the mining business, GK8 or other investments (none of which were owned by LLC), and to eliminate the tax reserve (which largely does not appear to relate to LLC's business).

The Examiner also removed 100% of the value attributable to Treasury CEL, which was initially issued and continued to be held by CNL following the Migration and was never owned by LLC.

49.    Based on those adjustments, the Examiner estimated that, as shown in the following table, LLC on a stand-alone basis has been insolvent since inception, with an adjusted net deficit fluctuating from the Migration to the Petition Date between approximately $1.5 billion and more than $2 billion.

| | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 |
|---|---|---|---|---|
| Celsius Network (UK) and Subsidiaries Net Equity / (Deficit) - Book Value | $    383,608 | $    (108,274) | $    (330,455) | $    (932,276) |
| **Elimination of Assets not Associated with Celsius Network (US)** | | | | |
| Value Attributed to CEL Treasury | $    (1,364,178) | $    (1,227,339) | $    (908,941) | $    (178,525) |
| Value Attributed to Non-Treasury CEL in excess of CEL Liabilities | (168,756) | (227,161) | (193,076) | (63,243) |
| Book Value of Celsius Mining LLC, net of Intercompany | (297,643) | (446,733) | (608,829) | (622,355) |
| Book Value of GK8 Ltd., net of Intercompany | - | (4,044) | (2,539) | (1,395) |
| Book Value of Other Investments (Incl. Grayscale Trust) | (437,280) | (445,927) | (84,700) | (31,601) |
| | $    (2,267,857) | $    (2,351,204) | $    (1,798,086) | $    (897,118) |
| **Elimination of Liabilities not Associated with Celsius Network (US)** | | | | |
| Celsius Network (UK) Deferred Tax Liability | $    349,250 | $    352,006 | $    352,006 | $    352,006 |
| **Celsius Network (US) Adjusted Net Equity / (Deficit)** | $    (1,535,000) | $    (2,107,472) | $    (1,776,535) | $    (1,477,388) |

## COUNT I

### (Avoidance and Recovery of Constructive Fraudulent Transfers — 11 U.S.C. §§ 548(a)(1)(B), 550)

50.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

51.    Plaintiff brings this claim under sections 548(a)(1)(B) and 550 of the Bankruptcy Code.  Section 548(a)(1)(B) of the Bankruptcy Code authorizes a debtor or a party acting on behalf of the estate to avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within two (2) years of the Petition Date, if the debtor received less than reasonably equivalent value in exchange for such transfer or obligation; and either (i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (ii) was engaged in business or a

transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or (iv) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

52.     On December 29, 2021, LLC and CNL entered into an Asset Transfer Agreement pursuant to which CNL transferred liabilities connected to its customer-facing business to LLC. The agreement was backdated to August 19, 2021.  The liabilities transferred from CNL to LLC were represented on CNL's accounting entries as worth $10.3 billion.

53.     No digital assets were transferred to LLC through the Asset Transfer Agreement.

54.     Also on December 29, 2021, and backdated to an effective date of August 19, 2021, LLC and CNL entered into an Intercompany Loan Agreement, pursuant to which CNL purportedly retained and continued to deploy digital assets associated with the business that had purportedly been transferred to LLC.  This transaction was characterized as a demand loan of crypto and fiat currencies from LLC to CNL.  Schedule A of the Intercompany Loan Agreement, which purported to list the assets being loaned to CNL, was left blank.

55.     Additionally, following the Migration and prior to the Petition Date, LLC and CNL engaged in further intercompany transfers of digital assets, including numerous transfers from LLC to CNL resulting in a purported net receivable from CNL to LLC of $1.2 billion, and clawbacks of a large number of digital assets that CNL initially transferred to LLC, resulting in an additional purported net receivable from CNL to LLC of $984.5 million (collectively, the "**LLC Asset Transfers**").

56.    The Asset Transfer Agreement, Intercompany Loan Agreement, and LLC Asset Transfers were made within two years prior to the Petition Date.

57.    LLC received less than reasonably equivalent value or did not receive fair consideration in exchange for the customer liabilities that CNL transferred to LLC.  LLC also received less than reasonably equivalent value or did not receive fair consideration in exchange for the LLC Asset Transfers to CNL.

58.    The Asset Transfer Agreement transferred only liabilities to LLC, not assets.  It did not set a rate at which interest would be paid to LLC or otherwise provide any consideration to LLC in connection with the $10.3 billion in liabilities that CNL transferred to LLC.

59.    The Intercompany Loan Agreement did not set a rate at which interest would be paid to LLC in consideration for its purported loan to CNL, instead noting that an interest rate would be set at an unspecified later date.  Such interest was never calculated, much less paid by CNL to LLC.  LLC received no consideration for the loan (to the extent it existed) to CNL of billions of dollar worth of assets, nor for the $10.3 billion in associated liabilities it assumed.

60.    LLC was thus encumbered with billions of dollars of liabilities to customers, but was not provided with any assets, interest or other reasonably equivalent value to meet those liabilities.  LLC was then further depleted of assets through the LLC Asset Transfers.

61.    LLC was insolvent on the date of the Asset Transfer Agreement, Intercompany Loan Agreement, and LLC Asset Transfers or was rendered insolvent as a result thereof; was engaged or about to engage in a business or transaction for which the remaining assets of LLC were unreasonably small on the date of the Asset Transfer Agreement, Intercompany Loan Agreement, and LLC Asset Transfers or as a result of these agreements and transfers; or intended

to incur, believed, or reasonably should have believed it would incur, debts beyond its ability to pay as such debts came due.

62.     LLC's creditors were thus harmed by the Asset Transfer Agreement, Intercompany Loan Agreement, and LLC Asset Transfers.

63.     By virtue of the foregoing, the transfer of liabilities to LLC, loan of digital assets back to CNL, and LLC Asset Transfers, were constructive fraudulent transfers avoidable under section 548(a)(1)(B) of the Bankruptcy Code.  Thus, LLC is entitled to avoid the Asset Transfer Agreement, Intercompany Loan Agreement, and LLC Asset Transfers.[12]

64.     Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 548 of the Bankruptcy Code, plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

65.     CNL is the initial transferee for whose benefit the Asset Transfer Agreement, Intercompany Loan Agreement, and LLC Asset Transfers were made.

66.     Therefore, the digital assets transferred or loaned from LLC to CNL via the Asset Transfer Agreement, Intercompany Loan Agreement, and LLC Asset Transfers, or the value of any such digital assets, are avoidable by LLC under section 548 of the Bankruptcy Code and recoverable by LLC under section 550 of the Bankruptcy Code.

67.     Additionally, the liabilities transferred from CNL to LLC via the Asset Transfer Agreement are avoidable by LLC under section 548 of the Bankruptcy Code, and LLC is entitled to a claim against CNL in the amount of those liabilities.

---

[12] LLC is also entitled to avoid the Novation Agreement, to the extent it was ever executed.

## COUNT II

**(Avoidance and Recovery of Constructive Fraudulent Transfers — 11 U.S.C. §§ 544(b)(1), 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, Delaware, and Nevada, and Sections 238 and 423 of the U.K. Insolvency Act 1986))**

68.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

69.     Plaintiff brings this claim under section 544(b)(1) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act, or its successor the Uniform Voidable Transactions Act, as enacted by New York, *see* N.Y. Debt. & Cred. Law §§ 270-281, Delaware, *see* 6 Del. C. §§ 1301-1311, New Jersey, *see* N.J.S.A. §§ 25:2-20 - 25:2-36, and Nevada, *see* NRS §§ 112.140 - 112.250, and sections 238 and 423 of the U.K. Insolvency Act 1986.[13]

70.     Section 544(b)(1) of the Bankruptcy Code authorizes a debtor or a party acting on behalf of the estate to avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim.

71.     As set out in Count I, on December 29, 2021 LLC and CNL entered into the Asset Transfer Agreement by which CNL transferred approximately $10.3 billion in liabilities to account holders connected to its customer-facing business to LLC, as well as the Intercompany Loan Agreement, by which LLC was made to permit CNL to retain certain digital assets in the form of a demand loan. Both agreements were back dated to August 19, 2021. LLC subsequently engaged in the LLC Asset Transfers to CNL for no or inadequate value. Together, these transactions

---

[13]    The Committee has included sections 238 and 423 of the U.K. Insolvency Act 1986 out of an abundance of caution to preserve these claims in the event that the Scheduling Order requires the Committee to bring all available constructive fraudulent conveyance claims at this time.

constitute transfers of interests in LLC's property made within two years prior to the Petition Date, made to and for the benefit of CNL.

72.    LLC received less than reasonably equivalent value or did not receive fair consideration in exchange for the customer liabilities that CNL transferred to LLC.    LLC also received less than reasonably equivalent value or did not receive fair consideration in exchange for the LLC Asset Transfers to CNL.

73.    The Asset Transfer Agreement transferred only liabilities from CNL to LLC, and did not transfer any assets.  It did not set a rate at which interest would be paid to LLC or otherwise provide any consideration to LLC in connection with the approximately $10.3 billion in liabilities that CNL transferred to LLC.

74.    The Intercompany Loan Agreement did not set a rate at which interest would be paid to LLC in consideration for its purported loan to CNL, instead noting that an interest rate would be set at an unspecified later date.  Such interest was never calculated, much less paid by CNL to LLC.  Therefore, LLC received no consideration for the loan (to the extent it existed) to CNL of billions of dollar worth of assets, nor for the $10.3 billion in associated liabilities it purported to assume under the Asset Transfer Agreement.

75.    LLC was thus encumbered with billions of dollars of liabilities to customers, but was not provided with any assets, interest or other reasonably equivalent value to meet those liabilities.  LLC was then further depleted of assets through the LLC Asset Transfers.

76.    LLC was insolvent on the date the Asset Transfer Agreement, Intercompany Loan Agreement, and LLC Asset Transfers were executed or was rendered insolvent as a result thereof; was engaged or about to engage in a business or transaction for which the remaining assets of LLC were unreasonably small on the date of the Asset Transfer Agreement, Intercompany Loan

Agreement, and LLC Asset Transfers or as a result of these agreements and transfers; or intended to incur, believed, or reasonably should have believed it would incur debts beyond its ability to pay as such debts came due.

77.      LLC's creditors were thus harmed by the Asset Transfer Agreement, Intercompany Loan Agreement, and LLC Asset Transfers.

78.      By virtue of the foregoing, the transfer of liabilities from CNL to LLC, loan of digital assets from LLC to CNL, and LLC Asset Transfers, were constructive fraudulent transfers avoidable under section 544(b)(1) of the Bankruptcy Code and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act, or its successor the Uniform Voidable Transactions Act, as enacted in the states of New York, New Jersey, Delaware, and Nevada and sections 238 and 423 of the U.K. Insolvency Act 1986.  Thus, Plaintiff is entitled to avoid the Asset Transfer Agreement, Intercompany Loan Agreement, and LLC Asset Transfers.

79.      Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 544 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

80.      CNL is the initial transferee for whose benefit the transfer of liabilities from CNL to LLC and the purported loan of digital assets from LLC to CNL were made.

81.      Therefore, the digital assets transferred or loaned to CNL via the Asset Transfer Agreement, Intercompany Loan Agreement, and LLC Asset Transfers or the value of those digital assets transferred to CNL are avoidable by Plaintiff under section 544(b) of the Bankruptcy Code and recoverable by Plaintiff under section 550 of the Bankruptcy Code.  Additionally, the liabilities transferred to LLC from CNL via the Asset Transfer Agreement are avoidable by Plaintiff under

section 544(b) of the Bankruptcy Code and LLC is entitled to a claim against CNL in the amount

of those liabilities.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor

against the Defendants as follows:

(a) Damages in an amount to be proven at trial;

(b) Punitive damages in an amount to be proven at trial;

(c) Determining that each of the transfers of (i) liabilities and obligations from CNL to LLC and (ii) assets from LLC to CNL, is avoidable as a fraudulent transfer pursuant to the applicable provisions of the Bankruptcy Code and applicable state and U.K. law, including, without limitation, sections 544, 548, and 550 of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, or its successor the Uniform Voidable Transactions Act, as enacted in the states of New York, New Jersey, Delaware, and Nevada, and sections 238 and 423 of the U.K. Insolvency Act 1986;

(d) Ordering that LLC may avoid the transfer of liabilities from CNL to LLC under the Asset Transfer Agreement and, at its election, assert a claim against CNL for the total value of the transferred liabilities, or, alternatively, allowing LLC's customers to recover the value of their claims directly from CNL;

(e) Ordering that LLC may recover, and CNL must turnover, for the benefit of the estate of LLC, any cryptocurrency transferred from LLC to CNL, or, in the alternative, if greater, U.S. dollars in an amount equal to the price of the transferred cryptocurrency on the day of the transfer, with interest;

(f) Granting Plaintiff costs of suit incurred herein, including, without limitation, attorneys' fees, costs, and other expenses incurred in this action;

(g) Granting Plaintiff pre- and post-judgment interest on the judgment amount to the fullest extent allowed by applicable law; and

(h) Ordering such other and further relief as the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated:  May 1, 2023
          New York, New York

/s/ Samuel P. Hershey

**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Joshua Weedman
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email:  david.turetsky@whitecase.com
          sam.hershey@whitecase.com
          jweedman@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email:  mandolina@whitecase.com
          gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email:  aaron.colodny@whitecase.com

*Counsel to the Official Committee of
Unsecured Creditors*